**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EARNESTINE MATTHEWS, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | 07 C 2487 |
| Plaintiff, | ) | |
| | ) | Judge Castillo |
| v. | ) | |
| | ) | Magistrate Judge Ashman |
| UNITED RETAIL INCORPORATED | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff, Earnestine Matthews, respectfully requests that this Court enter an order determining that this action alleging violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act ("FCRA"), be certified as a class action.

Plaintiff defines the class as "all consumers in Illinois to whom United Retail provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit card or debit card number, and/or (b) the expiration date of the person's credit or debit card."

Plaintiff further requests that counsel for plaintiff be appointed counsel for the class.

In support of this motion, plaintiff states as follows:

## NATURE OF THE CASE

1.     One provision of the December 2003 Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act ("FCRA"), codified as 15 U.S.C. §1681c(g), provides that:

> **No person that accepts credit cards or debit cards for the transaction of business  shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.**

2.     Section 1681c(g) is "not ambiguous."  It "expressly prohibits printing more than the last five digits of the credit/debit card numbers and also prohibits printing the card's expiration date." *Pirian v. In-N-Out Burgers*, 2007 U.S. Dist. LEXIS 25384, *8 (C.D.Cal. Apr. 5, 2007).

3.     On December 15, 2006, plaintiff received from United Retail at its store located

at 9730 S. Western Ave., Evergreen Park, Illinois a computer-generated cash register receipt which displayed her card expiration date.

4.     Defendant has admitted through discovery that its preliminary estimate that there are more then 20, 000 unique customers received receipts that displayed the customer's card expiration date since December 4, 2006.  (Exhibit 1).  It remains to be seen how many of these customers received multiple receipts.

5.     Section 1681c(g) is an essential protection against identity theft, which according to the Federal Trade Commission victimized some 9 million persons and caused over $57 billion in harm in 2006 alone. "Stevens ID Theft Prevention Act Passes Commerce Committee," States News Service, Apr. 25, 2007 (Exhibit 2).  One common *modus operandi* of identity thieves is to collect lost or discarded credit card receipts, or steal them, and use the information on them to engage in fraudulent transactions.  Identity thieves who do this are known as "carders" and "dumpster divers." This is more common than the use of sophisticated electronic means to obtain the information. Robin Sidel, "Identity Theft – Unplugged – Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way," *Wall Street Journal*, Oct. 5, 2006, p. B1 (Exhibit 3).

6.     To curb identity theft, Congress prohibited merchants who accept credit cards and debit cards from issuing electronically-generated receipts that display either the expiration date or more than the last five digits of the card number.  The law gave merchants who accept credit  and debit cards up to three years to comply.  Full compliance was required by December 4, 2006.

7.     The need to "truncate" receipts was widely publicized among retailers.  For example, the CEO of Visa USA, Carl Pascarella, explained on March 6, 2003 that "Today, I am proud to announce an additional measure to combat identity theft and protect consumers.  Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts.  The card's expiration date will be eliminated from receipts altogether.... The first phase of this new policy goes into effect July 1, 2003 for all new terminals. . . . ." "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New

Initiative at Press Conference With Sen. Dianne Feinstein," PR Newswire, March 6, 2003 (Exhibit 4).

8.     The August 12, 2006 edition of "Rules for Visa Merchants" (Exhibit 5, p. 62), which is binding upon all merchants that accept Visa cards,  similarly makes clear that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."   VISA required complete compliance by merchants accepting Visa card by July 1, 2006, five months ahead of the statutory deadline.  (*Id.*)

9.     Most of defendant's business peers and competitors readily brought their receipt printing process into compliance.

10.     A private remedy is provided by FCRA §1681n, which provides:

**§1681n.  Civil liability for willful noncompliance**

**(a) In general.  Any person who willfully fails to comply with any requirement imposed under this title [15 USC §§1681 et seq.] with respect to any consumer is liable to that consumer in an amount equal to the sum of–**

**(1)**

**(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $ 100 and not more than $ 1,000...**

### CLASS CERTIFICATION REQUIREMENTS

11.     All requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil  Procedure have been met.

12.     Once again, defendant has admitted through discovery that more then 20, 000 unique customers received receipts that displayed the customer's card expiration date since December 4, 2006.  (Exhibit 1).

13.     There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  The predominant common questions include the following:

        a.     Whether defendant had a practice of providing customers with a sales or

3

transaction receipt on which defendant printed more than the last five digits of the credit card or debit card and/or the expiration date of the credit card or debit card;

      b.     Whether defendant thereby violated FACTA; and

      c.     Whether defendant's conduct was willful.

14.     Plaintiff's claims are typical of those of the class members. All are based on the same factual and legal theories.

15.     Plaintiff will fairly and adequately represent the class members. Plaintiff has no interests that conflict with the interests of class members. Plaintiff has retained experienced counsel. (<u>Exhibit 6</u>.)

16.     A class action is superior for the fair and efficient adjudication of the class members' claims, in that:

      a.     Consumers are unlikely to recognize the violation; and

      b.     Individual actions are uneconomical.

17.     Courts have recently held that actions alleging willful FCRA violations and seeking statutory damages are appropriate for class resolution. *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006); *Claffey v. River Oaks Hyundai, Inc.*, 238 F.R.D. 464, 468 (N.D.Ill. 2006); *Murray v. E\*Trade Financial Corp.*, 240 F.R.D. 392 (N.D.Ill. 2006); *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387 (N.D.Ill. 2006); *Murray v. New Cingular Wireless Services, Inc.*, 232 F.R.D. 295 (N.D.Ill. 2005).

18.     In further support of this motion, plaintiff submits the accompanying memorandum of law.

WHEREFORE, plaintiff respectfully requests that this Court enter an order determining that this action may proceed as a class action and counsel for plaintiff be appointed class counsel.

Respectfully submitted,


/s/Keith J. Keogh

Keith J. Keogh
Alexander H. Burke
LAW OFFICES OF KEITH J. KEOGH, LTD.
227 W. Monroe Street, Suite 2000
Chicago, IL 60606
(312) 726-1092
(312) 726-1093 (fax)

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EARNESTINE MATTHEWS, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. 07 C 02487 ) |
| v. | ) Judge Castillo ) |
| UNITED RETAIL INCORPORATED, | ) Magistrate Judge Ashman ) |
| Defendant. | ) |

## DEFENDANT UNITED RETAIL INCORPORATED'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Defendant United Retail Incorporated ("United Retail"), under the Federal Rules of Civil Procedure, hereby responds to Plaintiff's First Set of Requests for Admission as follows.

## GENERAL OBJECTIONS AND PRELIMINARY STATEMENTS

A. United Retail objects to the Requests to the extent that they call for the production of confidential, proprietary, and/or trade secret information. United Retail will not produce confidential information except pursuant to the protective order entered in this case, and it will not produce trade secret information unless ordered to do so by a court.

B. United Retail objects to the Requests to the extent that they seek disclosure of the content of communications between United Retail and its legal counsel on the ground that such information is protected by the attorney-client privilege.

C. United Retail objects to the Requests to the extent that they seek information or documents prepared in anticipation of litigation in this case on the grounds that such information and documents are protected under the work-product doctrine.

D.     United Retail objects to the Requests to the extent that they seek information that does not pertain to members of the putative class defined in the Complaint in this lawsuit.

E.     United Retail objects to the Plaintiffs' definitions of "you" as overly broad and unduly burdensome, and not limited in time or scope to reasonably relate to the material allegations in this lawsuit or reasonably calculated to lead to the discovery of admissible evidence. Accordingly, United Retail will respond to these Requests only to the extent that the term "you" is interpreted to mean the entities United Retail Incorporated and United Retail Group, Inc.

F.     United Retail responds to these Requests without waiving any objections to relevance, privilege, or admissibility of any information provided by United Retail in any subsequent proceeding, or at the trial of this or any other action.

G.     By its responses, United Retail does indicate its agreement with Plaintiffs characterizations and does not make any admission that its conduct violated the FCRA or that Plaintiffs interpretations of the FCRA are correct.

H.     All responses are made subject to and without waiver of United Retail's general and specific objections. These general and specific objections are incorporated in full into each of the responses below.

## RESPONSES TO REQUESTS FOR ADMISSIONS

1.    On December 15, 2006, United Retail provided plaintiff at its store located at
9730 S. Western Ave., Evergreen Park, Illinois a computer-generated cash register receipt which
displayed her card expiration date.

**Response:    Based upon information and belief and a review of the receipt**

**provided by Plaintiff's counsel, admitted.**

2.    Since December 4, 2006, defendant's Illinois stores have provided more than
20,000 persons computer-generated cash register receipts that displayed the customers' card
expiration dates.

**Response:    After reasonable inquiry, the information known by or readily**

**available to United Retail is insufficient to enable it to admit or deny this Request.**

**Responding further, upon information and belief and based on the investigation conducted**

**to date, United Retail's preliminary estimate is that its Illinois stores printed receipts that**

**may have displayed the customers' card expiration dates for more than 20,000 unique**

**customers since December 4, 2006.**

3.    Defendant willfully violated the FCRA by failing to truncate the expiration date
from its customers' credit and debit card receipts.

**Response:    Denied.**

4.    On December 3, 2006, defendant knew that providing credit and/or debit card
receipts with expiration dates printed on them was prohibited by FACTA and the FCRA.

**Response:    Denied.**

5.    Defendant received at least one communication from a credit card issuer, bank or
other entity notifying it of FACTA's expiration date truncation requirement, before December 4,
2006.

**Response:    United Retail objects to the use of the vague term "FACTA's**

**expiration date truncation requirement," as it conflicts with the definitions provided by**

**Plaintiff. After reasonable inquiry, the information known by or readily available to**

**United Retail is insufficient to enable it to admit or deny this Request. Responding further,**

United Retail denies that it is aware of any communications from a credit card issuer, bank, or other entity notifying United Retail of "FACTA's expiration date truncation requirement" before December 4, 2006.

6. At least one of defendant's stores nationwide did not provide any computer-generated cash register receipts to customers that displayed the customer's card expiration date.

**Response:** United Retail objects to this Request as vague and not readily susceptible to response as it does not make clear if the Request relates to the entire time period identified in the instructions or to any one point in time during that time period. United Retail admits that, at one point in time since January 1, 2002, at least one of its stores did not provide any computer-generated cash register receipts to customers that displayed the customer's card expiration date.

Dated: September 5, 2007

**UNITED RETAIL INCORPORATED**

By: 

One of its Attorneys

Michael O'Neil (ARDC #06201736)
Albert E. Hartmann (ARDC #06256064)
**DLA PIPER US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
312-368-4000

## CERTIFICATE OF SERVICE

I, Albert E. Hartmann, an attorney, depose and state that I caused the above and foregoing to be served upon the following:

Keith James Keogh
Alexander Holmes Burke
Law Offices of Keith J. Keogh
227 West Monroe Street #2000
Chicago, IL 60606

by causing copies to be served via U.S. mail addressed to the above named counsel on September 5, 2007, from 203 N. LaSalle St., Chicago, Illinois 60601.

Albert E. Hartmann

# EXHIBIT 2

Back to Story | Print 🖨 | Close ☒



**U.S. SENATE COMMITTEE ON**

# Commerce, Science, and Transportation

DANIEL INOUYE, Chairman                    TED STEVENS, Vice Chairman

**For Immediate Release**
**April 25th, 2007**

### STEVENS AND INOUYE ID THEFT PREVENTION ACT PASSES COMMERCE COMMITTEE

WASHINGTON, D.C. – The Senate Committee on Commerce, Science and Transportation today passed S. 1178 the "Identity Theft Prevention Act." Committee Vice Chairman Senator Ted Stevens (R-Alaska) and Commerce Committee Chairman Daniel Inouye (D-Hawaii) introduced the legislation and it is cosponsored by Senator Gordon Smith (R-Ore.) and Senator Mark Pryor (D-Ark.) and Senator Bill Nelson (D-FL). This bill would strengthen information safeguards and ensure notification to consumers whose sensitive personal information has been acquired without authorization. The bill would also direct the Federal Trade Commission (FTC) to enforce rules to protect such information. Under the bill, consumers would be able to freeze their credit for a reasonable fee to protect themselves from identity theft. The bill now moves to the Senate where it awaits consideration.

**"ID theft is a growing problem that plagues Americans in the far reaches of our nation and everywhere in between," said Senator Stevens. "Studies of identity theft show that Alaskans are particularly susceptible to this criminal activity. It is time for Congress to act. We must take steps to help people protect themselves. I urge the Senate to take up this bill, which has received broad bipartisan support, and pass it quickly."**

Identity theft has risen dramatically nationwide over the past decade and the FTC estimates that each year nearly 9 million Americans – or roughly 4.6 percent of the domestic adult population – are victimized by identity thieves. The FTC indicates that physical and online identity theft accounted for 40 percent of the more than 616,000 consumer fraud complaints filed last year with the agency. The costs associated with identity theft are enormous. In 2006, it is estimated that the losses to businesses and financial institutions due to identity theft totaled $52.6 billion, and the out-of-pocket losses to consumers totaled $5 billion, which does not take into account the average 300 hours spent by each victim to restore their good name.

# EXHIBIT 3

**NEXT OPRAH:**

Mary Winkler: The Wife Who Killed Her Pastor Husband



post-gazette**NOW**
*Pittsburgh Post-Gazette*

Living

# Identity theft -- unplugged

Monday, October 10, 2005
By Robin Sidel, The Wall Street Journal

Worried that shadowy gangs of Russian hackers are breaking into computer networks, stealing your financial secrets? Don't lose too much sleep over it.

But you might want to hide your checkbook when friends and relatives come visit your home.

Despite a series of alarming reports in recent months about security breaches that have made personal data potentially vulnerable to crooks -- such as the one at credit-card processor CardSystems Solutions Inc. affecting 40 million credit-card accounts -- most bank-related crimes remain stubbornly low-tech. They range from simple forgery of a check, to unauthorized credit-card use, to Dumpster-diving, which is when someone plucks a bank statement or credit-card bill from your garbage.

And the perpetrator probably may not be a stranger.

According to one recent study, by Javelin Strategy &amp; Research, a consulting firm in Pleasanton, Calif., in 26 percent of all cases the fraud victims knew the person who had misused their personal information. (Typically it was a family member, friend or neighbor, or in-home employee.) In addition, as much as 50 percent of debit-card fraud occurs when a card is snagged by a family member or friend who knows the card's personal-identification number, according to a recent report from TowerGroup, a unit of MasterCard International Inc.

The term "identity theft" is often used loosely to describe a wide array of crimes. But true identity theft occurs when someone uses stolen information to create a new form of identity, such as opening a new credit-card account under the victim's name. That differs significantly from other kinds of bank fraud, such as when a criminal uses a stolen ATM card to get cash out of a teller machine.

Whether it's full-blown ID theft or small-scale fraud, even in cases where the criminal is a stranger, it's almost never a case of sophisticated computer hacking. Although 75 percent of all households use the Internet and 65 percent of those do some online banking, "most criminals obtain personal information through traditional rather than electronic channels," according to the Javelin study. Some 29 percent of victims surveyed said their personal

information was obtained through a lost or stolen wallet, checkbook or credit card.

According to the study, the bulk of the rest were attributed to friends and relatives, corrupt employees, stolen mail, Dumpster-diving, and computer spyware. Computer viruses or hackers accounted for only 2.2 percent of incidents. While there has been a significant increase in the number of electronic attempts at identity theft, "the ones that are working are the traditional ones," said James Van Dyke, Javelin's president.

The Federal Trade Commission itself defines identity theft broadly, describing it as when someone possesses or uses a person's personal or financial information without their knowledge with the intent of committing fraud or other crimes.

The commission estimates that identity theft affects nearly 5 percent of the adult population, costing businesses and individuals a combined \$53 billion annually. It received 246,000 reports of identity theft last year, nearly triple the number received in 2001. The FTC has attributed much of that rise to heightened awareness of the issue among consumers, making them more likely to report incidents as identity theft.

Overall, statistics on identity theft are spotty. For one thing, research has found that most victims of identity theft don't report the crime to police. In many cases, they aren't even certain that they are truly crime victims and don't know how the incident occurred. Banks increasingly alert authorities when incidents occur, but even those disclosures can be incomplete.

There are a number of steps individuals can take to protect themselves.

Many financial institutions are increasingly urging their clients to start using paper shredders at home. Household models can be relatively inexpensive, and they significantly reduce the chances that a criminal can find any useful personal information in the trash. Banks typically recommend shredding documents that contain account information, Social Security numbers, credit-card and ATM receipts and credit-card offers. Also, shred blank checks that sometimes come in the mail as part of a solicitation.

Another suggestion: Be particularly aware if credit-card bills or bank statements are missing from the mailbox. If a bill arrives more than two weeks late, the American Bankers Association suggests contacting the local post office to be sure it isn't being forwarded without the recipient's knowledge. Also check with the company where the bill originated.

It's also wise to avoid disclosing any personal information on forms or applications unless absolutely necessary, says Mike Cunningham, senior vice president in the credit-card fraud department at J.P. Morgan Chase &amp; Co.

As an example, Mr. Cunningham says, he was recently filling out an application to be a coach on his son's neighborhood football team in Arizona, and the form asked for his social security number, driver's license number and other personal information. He declined to provide the information, because there was no way for him to know whether his personal information would be kept under lock and key.

"I just told the team mom that I didn't see why they needed it -- it was the perfect amount of information for an identity thief," he said. He got the job anyway.

The only organizations you're required to provide with your social security number are your employer and your financial institutions. (This is for tax purposes.) If anyone else asks -- say, a retailer -- you don't have to give it. The company can decline to provide the service, but it's worth asking what other identification they might accept instead.

Amid the proliferation of old-fashioned fraud, some financial institutions are fighting back by urging their customers to abandon paper statements altogether and instead view their accounts online. Among them is E.Trade Financial Corp., which says its online system is more secure than paper statements that can be stolen or copied. A spokeswoman declined to specify how much money the company will save by eliminating the printing and mailing of paper statements.

Banks are having a particularly tough time battling one of the oldest and most common kinds of crime: check fraud. Attempts of check fraud rose to $5.5 billion in 2003 from $4.3 billion in 2001, according to the American Bankers Association. The incidents resulted in losses of $677 million, representing a slight decline from $698 million in 2001; the trade group attributed the drop to better fraud-detection methods.

That slight decline isn't so reassuring to Lee Roberts, senior vice president at National Penn Bancshares Inc., a regional bank based in Boyertown, Pa. As recently as the past few weeks, the bank has been hit by a wave of incidents in which criminals have copied checks and then altered them for fraudulent use. That practice "has been around for seven or eight years," says Mr. Roberts. But as photocopiers and image-manipulation computer software become more sophisticated, he says, "they're getting better at it."

------

## Battling Identity Theft

Despite all the buzz about high-tech online identity theft, most instances revolve around old-fashioned fraud such as forging a signature on a check. Here are steps for reducing the risk:

◼ Check up on yourself regularly

Get a copy of your credit report every year from each of the major credit bureaus (TransUnion, Equifax, Experian) to make sure the records are accurate. Also, closely review all monthly bank and billing statements for discrepancies.

◼ Travel light

Avoid carrying around credit-card or personal documents unless you really need them.

◼ Keep personal data under wraps

Don't share personal ID numbers or passwords with anyone. Don't provide information over the phone or hand over personal data unless you know why it is needed. Keep a list of all account numbers in a secure place so that you have quick access if cards or documents get stolen or lost.

■ Buy a shredder for the home

Tear up or shred all credit-card receipts and all new-card offers that arrive in mail. Also destroy all documents that contain account numbers or other personal financial information.

■ Check the mail

Don't let mail sit in the mailbox for days on end. And don't place sensitive outgoing mail, such as bills, in your home mailbox to await collection. Instead, drop it in a collection box. Sources: Federal Trade Commission, American Bankers Association

First published on October 10, 2005 at 12:00 am

# EXHIBIT 4



Wednesday 12. September 2007
ies Cost Â£130 Million Daily  + + +  Ad: FORGET Filesharing like eDonkey or BitTorrent! Download uncensored Pictures, Softwar

**America's Payment Systems**
**Retriever Payment S**

About
News
Quotes
Clients
Resources
Careers
Services
F.A.Q.
Privacy Policy

Reliability

How long have
we done this?
Top
Home
Contact
    Whats best for
    your business

What can we do
for your
business?

Industry News

**Visa USA *Announces Account Truncation Initiative to Protect Consumers from ID Theft***
**Visa CEO Announces New Initiative at Press Conference with Sen. Dianne Feinstein**



**Washington, DC, March 6, 2003**

At a press conference today on Capitol Hill with Senators Dianne Feinstein (D-CA), Judd Gregg (R-NH), Jon Corzine (D-NJ) and Patrick Leahy (D-VT), Visa USA CEO Carl Pascarella, announced Visa USA's new account truncation program to protect consumers from identity theft. The following are excerpts of Mr. Pascarella's remarks:

"I am here today to talk about the steps that Visa is taking to put identity theft protections in place. Visa USA and our Member financial institutions have a long history of using state of the art technology to further protect cardholder information. Visa was the first payments company to adopt a zero liability policy for unauthorized purchases, and we've continued this leadership role with Verified by Visa, which authenticates cardholders for Internet purchases, and our sophisticated neural networks that monitor spending anomalies.

"We have also implemented our Cardholder Information Security Program, or CISP, a set of 12 requirements for protecting cardholder data for which all Visa payment system participants need to comply. In fact, Visa is adding more resources to our auditing process to ensure any entity that touches a Visa transaction will be compliant with our Cardholder Information Security

Program rules. The CISP "Digital Dozen" was the first set of standards within the payments industry for protecting cardholder data and served as a best practices model by the G-8 conference on cyber-crime in Tokyo.

"Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. This is an added security measure for consumers that doesn't require any action by the cardholder. We are proud to be the first payments brand to announce such a move to protect cardholders' identities by restricting access to their account information on receipts.

" The first phase of this new policy goes into effect July 1, 2003 for all new terminals. I would like to add, however, that even before this policy goes into effect, many merchants have already voluntarily begun truncating receipts, thanks to groundwork that we began together several years ago.

" Receipt truncation is good news for consumers, and bad news for identity thieves. Identity thieves thrive on discarded receipts and documents containing consumers' information such as payment account numbers, addresses, Social Security numbers, and more. Visa's new policy will protect consumers by limiting the information these thieves can access.

" Visa's new receipt truncation measure builds upon our other security measures I mentioned, zero liability cardholder protection, Verified by Visa, neural networks and the Cardholder Information Security Program.

" Our receipt truncation policy is the latest initiative in Visa's broader identity theft consumer protection effort. I can't go into the details at the moment, but we will be announcing a series of additional steps to combat identity theft and offer tools to consumers.

" Visa is focused on maintaining the trust we have earned

through our security leadership. Because there is no silver bullet to eliminate identity theft, we are constantly adding new layers of security to protect cardholders. As a result of these, and many other security measures, fraud within the Visa system has fallen to an all-time low of just 7 cents per $100 transacted.

" Visa U.S.A. is pleased to be working with Senator Feinstein, and the other senators here today in the fight to protect consumers from identity theft. We look forward to continuing our joint efforts; after all, we share the same goals."

©Copyright 2004 RPS America All Rights Reserved
For more information feel free to Contact Us

# EXHIBIT 5



# Rules for Visa Merchants
Card Acceptance and Chargeback
Management Guidelines





# Transaction Receipt Requirements—
# Card-Present Merchants

The following are Visa requirements for all transaction receipts generated from electronic point-of-sale terminals (including cardholder-activated terminals).

## Electronic Point-of-sale Terminal Receipts

**Merchant or member name and location, or the city and state of the Automated Dispensing Machine or Self-Service Terminal**

**Transaction Date**

**Merchant Location Code**

Effective November 1, 2005, the payment brand used to complete the transaction must be identified on the cardholder's copy of the transaction receipt.

**Authorization Code, if applicable,** except for Express Payment Service Transactions.

**Space for Cardholder Signature,** except for:

- Transactions in which the PIN is an acceptable substitute for Cardholder signature
- Limited-Amount Terminal Transactions
- Self-Service Terminal Transactions
- Express Payment Service Transactions



```
        XYZ SHOES
       1040 PARK ST
      ANYTOWN, CA 94501
   PHONE # (000)555-5555
   NOV 10, 2005   12:30PM

    MERCH ID:  08233004

REF # : 003
ACT # : ************5220
EXP   : XX/XX
CARD  : VISA
                  $21.69

APPROVAL CODE:    035789
TRAN ID: VGT7ET800815

  I AGREE TO PAY ABOVE
  TOTAL AMOUNT ACCORDING
  TO CARD ISSUER AGREEMENT

X
   _____
          SIGNATURE

        THANK YOU
      CARDHOLDER COPY
```

**Truncated Account Number**
Visa requires that all new electronic POS terminals provide account number truncation on transaction receipts. This means that only the last four digits of an account number should be printed on the customer's copy of the receipt.

In addition, the expiration date should not appear at all. Existing POS terminals must comply with these requirements by July 1, 2006. To ensure your POS terminals are properly set up for account number truncation, contact your merchant bank.

**Transaction Amount**

Rules for Visa Merchants--Card Acceptance and Chargeback Management Guidelines

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution

# EXHIBIT 6

## DECLARATION OF KEITH J. KEOGH

Keith J. Keogh declares under penalty of perjury, as provided for by §1-109 of the Illinois Code of Civil Procedure, that the following statements are true:

The Law Offices of Keith J. Keogh, Ltd. consists of two attorneys and a paralegal as well as receptionists. The firm focuses on consumer protection cases for both individuals and class actions.

I am a partner of the firm and member of United States Court of Appeals for the Seventh Circuit, Northern District of Illinois, Southern District of Indiana, and Illinois State Bar as well as several bar associations and the National Association of Consumer Advocates and Association of Trial Lawyers of America.

I was lead counsel in the following class settlements: *Overlord Enterprises v. Wheaton Winfield Dental Associates*, 04 CH 01613, Circuit Court Cook County (Judge McGann)(Final Approval Pending); *Whiting v SunGard*, 03 CH 21135, Circuit Court Cook County (Judge McGann); *Whiting v. GoIndustry*,03 CH 21136, Circuit Court Cook County (Judge McGann). I was the attorney primarily responsible for the following class settlements: *Wollert v. Client Services*, 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas v. Vacation Break USA*, 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald v. Washington Mutual Bank*, supra; *Wright v. Bank One Credit Corp.*, 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga v. Columbia Mortgage*, 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier v. Provident Mortgage*, 00 C 5464 (N.D. Ill. Judge Coar); *Largosa v. Universal Lenders*, 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga v. GN Mortgage*, (N.D. Ill. Judge Holderman); *Williams v. Mercantile Mortgage*, 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid v. First American Title*, 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant*

*v. Old Kent*, 99 C 6846 (N.D. Ill. Magistrate Judge Bobrick); *Mendelovits v. Sears*, 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon v. Washington Mutual*, 01 C 1645 (N.D. Ill. Judge Alesia).

The individual class member's recovery in some of these settlements were substantial. For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $1,000 to $9,000 per class member. In another case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431. *McDonald v. Washington Mutual Bank*

Some reported cases of mine involving consumer protection cases include: *Echevarria et al. v. Chicago Title and Trust Co.*, 256 F.3d 623 (7th Cir. 2001); *Hill v. St. Paul Bank*, 329 Ill. App. 3d 705 (1st Dist. 2002); *Cook v. River Oaks Hyundai, Inc.*, 2006 U.S. Dist. LEXIS 21646 (N. D. Ill. 2006); *Gonzalez v. W. Suburban Imps.*, Inc., 411 F. Supp. 2d 970 (N.D. Ill. 2006); *Eromon v. Grand Auto Sales, Inc.*, 333 F. Supp. 2d 702 (N.D. Ill. 2004); *Williams v. Precision Recovery, Inc.*, 2004 U.S. Dist. LEXIS 6190 (N.D. Ill. 2004); *Doe v. Templeton*, 2003 U.S. Dist. LEXIS 24471 (N.D. Ill. 2003); *Ayala v. Sonnenschein Fin. Servs.*, 2003 U.S. Dist. LEXIS 20148 (N.D. Ill. 2003); *Gallegos v. Rizza Chevrolet, Inc.*, 2003 U.S. Dist. LEXIS 18060 (N.D. Ill. 2003); *Szwebel v. Pap's Auto Sales, Inc.*, 2003 U.S. Dist. LEXIS 13044 (N.D. Ill. 2003); *Johnstone v. Bank of America*, 173 F. Supp.2d 809 (N.D. Ill. 2001); *Leon v. Washington Mutual Bank*, 164 F. Supp.2d 1034 (N.D. Ill. 2001); *Ploog v. HomeSide Lending*, 2001 WL 987889 (N.D. Ill. 2001); *Christakos v. Intercounty Title*, 196 F.R.D. 496 (N.D. Ill. 2000); *Batten v. Bank One*, 2000 WL 1364408 (N.D. Ill. 2000); *McDonald v. Washington Mutual Bank*, 2000 WL 875416 (N.D. Ill. 2000); and *Williamson v. Advanta Mtge Corp.*, 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. 1999). The *Christakos* case significantly broadened title and mortgage companies' liability under Real Estate Settlement Procedures Act ("RESPA") and *McDonald* is the first reported decision to certify a class regarding

mortgage servicing issues under the Cranston-Gonzales Amendment of RESPA.

I have argued before the Seventh Circuit, the First District of Illinois and the Multi-Litigation Panel in *Sawyer v Esurance* (Ruling Pending) , *Echevarria, et al. v. Chicago Title and Trust Co.*, *Hill v. St. Paul Bank*, and *In Re: Sears, Roebuck & Company Debt Redemption Agreements Litigation*, MDL Docket No. 1389.

*Echevaria* was part of a group of several cases that resulted in a nine million dollar settlement with Chicago Title.

My published works include co-authoring and co-editing the 1997 supplement to *Lane's Goldstein Trial Practice Guide* and *Lane's Medical Litigation Guide*.

In January 2007, Alexander H. Burke joined the firm. Mr. Burke previously worked for a consumer class action firm, and has devoted his legal career to protection of consumers' rights. Notable court opinions from cases that he litigated include: *Barnes v. FleetBoston Fin. Corp.*, C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement); *Longo v. Law Offices of Gerald E. Moore & Assocs., P.C.*, 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.*, case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.*, case No. 2:03 cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.*, case nos. 03 C 5811, 03 C 6186, 2006 U.S. Dist. LEXIS 42900 (N.D. Ill. June 5, 2006) (granting class certification); *Rawson v. Credigy Receivables, Inc.*, case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in case against debt collector for suing on time-barred debts); *In re*

*Kingen*, no. 01-84275, adv. No. 03-8020, 2004 Bankr. LEXIS 146 (Bankr.C. D. Ill. Feb. 17, 2004) (extending bankruptcy law in favor of debtor).

Mr. Burke graduated from Colgate University in 1997 (B.A. International Relations), and Loyola University Chicago School of Law in 2003 (J.D.).

During law school he served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. He also served as an extern for the United States Attorney for the Northern District of Illinois and was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. Mr. Burke's published work includes *International Harvesting on the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing*, 14 Loy. Consumer L. Rev. 125 (2002).

Mr. Burke is licensed to practice law in the State of Illinois and is a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern District of Wisconsin, Northern District of Indiana and Southern District of Indiana. Mr. Burke is also an active member of the Chicago Bar Association, Illinois Bar Association and the National Association of Consumer Advocates.

Executed at Chicago, Illinois, on September 12, 2007

Keith J. Keogh